IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 15, 2015

CHRISTOPHER KINSLER v. STATE OF TENNESSEE

Appeal from the Criminal Court for Hamblen County
No. 14-CR-271    Thomas J. Wright, Judge

_____

No. E2015-00862-CCA-R3-PC – Filed March 17, 2016
_____

The petitioner, Christopher Kinsler, appeals the denial of his petition for post-conviction relief. He argues that he received the ineffective assistance of counsel when trial counsel elicited inadmissible hearsay testimony on cross-examination and then failed to object to the testimony. Following our thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. ROGER A. PAGE, J., not participating.

Joseph O. McAfee, Greeneville, Tennessee, for the Appellant, Christopher Kinsler.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Dan Armstrong, District Attorney General; and Kim Morrison, Assistant District Attorney General, for the Appellee, State of Tennessee.

OPINION

FACTS AND PROCEDURAL HISTORY

After a jury trial, the petitioner was convicted of fourth offense driving under the influence ("DUI"). *State v. Christopher S. Kinsler*, No. E2012-01895-CCA-R3-CD, 2013 WL 5873075, at *1 (Tenn. Crim. App. Oct. 30, 2013), *perm. app. denied* (Tenn.

Apr. 11, 2014). On appeal, this court summarized the facts underlying the petitioner's conviction as follows:

This case relates to the [petitioner's] conviction for driving under the influence after his car was found parked in the middle of a road. At the trial, Morristown Police Officer David Campbell testified that he had been a police officer for eight years and had received DUI training. He said that on February 19, 2011, he saw a white Camaro parked in the road and that the driver's side tires were about one to two feet in the oncoming lane of traffic. He said that the road did not have painted lines but that a crack ran through the center. He noticed that the passenger-side door was open and said he watched the car for a few seconds but did not see any movement. He said he approached the car.

A video recording of the officer's actions was played for the jury, which showed the [petitioner's] car parked in the right-hand lane of travel with the driver's side tires across the center of the unmarked road. The passenger-side door was open as Officer Campbell approached the driver's side door. The officer asked the [petitioner] what he was doing in the middle of the road, and the [petitioner] said, "to let him out." The officer asked for the [petitioner's] identification, and the [petitioner] asked why he wanted to see it. The [petitioner] said that the car was parked on the side of the road, that they were not bothering anyone, and that the officer could charge them if he wanted. The officer told the [petitioner] that his car was parked in the middle of the road. When asked how much alcohol the [petitioner] had consumed, he said, "not much." The [petitioner] told the officer that he and his wife had an argument.

The video recording showed that a second officer approached the passenger-side door while Officer Campbell returned to his police cruiser. Officer Campbell returned to the [petitioner's] car, and the second officer told Officer Campbell that the [petitioner] was reaching for the car keys. When Officer Campbell told the [petitioner] to get out of the car, the [petitioner] said he was only talking to his friends. The [petitioner] was placed in handcuffs and taken into custody. He asked the officers what the problem was with his sitting in the car and talking to his friends while intoxicated. Officer Campbell stated that he saw one open beer bottle inside the car and that Ralph Davis, a passenger, admitted the bottle was his.

The video recording showed two passengers inside the car. Ralph Davis told Officer Campbell that he and the second passenger were

2

brothers. The car was located near the Davis brothers' sister's home, and Officer Campbell walked to their sister's home. Officer Campbell told her that the [petitioner's] car was parked in the middle of the road, that all three men were intoxicated, and that the [petitioner] was going to jail. The sister permitted the brothers to stay overnight at her home.

Officer Campbell testified that the [petitioner] was in the driver's seat, that two passengers were inside the car, and that one of the passengers had an open beer. He said he immediately noticed the odor of alcohol and the [petitioner's] slurred speech. He said he obtained the [petitioner's] driver's license and returned to his police cruiser. He said that while he was at his cruiser, Lieutenant Antrican arrived and approached the passenger-side door. Officer Campbell returned to the [petitioner's] car and said that Lieutenant Antrican told him the [petitioner] was reaching for the car keys. He concluded that the [petitioner] was a "flight risk" and placed the [petitioner] under arrest. He said his usual practice was to request an individual perform sobriety tests at the local jail when he believed the person was a flight risk. He said that during the trip to the jail, he asked the [petitioner] if he would submit to a breathalyzer test and that the [petitioner] refused to submit to "any kind of test."

On cross-examination, Officer Campbell testified that he watched the [petitioner's] car for about thirty seconds before approaching it and that the car did not move. He said it did not require much training to determine the [petitioner] was intoxicated. He asked the [petitioner] why his car was parked in the middle of the road and why the door was open but did not recall mentioning he was investigating whether the [petitioner] was driving under the influence or asking the [petitioner] whether he had been driving the car. He did not know whether the car would start and assumed it would.

Officer Campbell testified that he looked inside the car, although Lieutenant Antrican performed an inventory search. He denied seeing tools, electrical fuses, or tape. On redirect examination, he stated that he saw no evidence to suggest the car had been parked in the road for any length of time. On recross-examination, he denied feeling the hood to determine if the engine was warm.

Morristown Police Lieutenant Nathan Antrican testified that on February 19, 2011, he assisted Officer Campbell at the scene. He said that he approached the [petitioner's] car, that the [petitioner] was in the driver's seat, and that two passengers were inside. He saw the keys in the ignition

3

and an open beer bottle. He concluded based on his experience and training that the [petitioner] was under the influence of alcohol.

On cross-examination, Lieutenant Antrican testified that the [petitioner's] car was not running when he arrived and that he never attempted to start the car. He said he assumed the car was operational and did not feel the hood to determine if the engine was warm. He did not know if the car broke down and stopped in the middle of the road. He agreed the video recording showed that the term "DUI" was never mentioned to the [petitioner]. On redirect examination, he stated that nobody said the car would not start.

Rick Long, owner of Extreme Towing and Automotive, testified that he towed cars and trucks for the Morristown Police Department and that he towed a white 1995 Chevrolet Camaro on February 19, 2011. He said that he parked the car inside a building at his business and that when he attempted to move the car outside, it would not start. He said that the [petitioner's] wife called about picking up the car and that he requested she bring written permission from the [petitioner] allowing him to release the car to her. He said that the [petitioner's] wife brought the authorization, that he released the car to her, and that she drove the car away.

Mr. Long testified that based on his experience, a kill switch was a button on a vehicle that stopped all electricity to the vehicle, preventing it from starting. He agreed the engine would not operate if the kill switch were used.

On cross-examination, Mr. Long testified that he did not see Ms. Kinsler arrive at his business, that he assumed someone brought her there, and that he did not know what, if anything, the person who brought Ms. Kinsler did while she obtained the [petitioner's] car. He denied seeing a kill switch on the car. He said that electrical problems and blown fuses might prevent a car from starting. He did not know what prevented the car from starting.

On redirect examination, Mr. Long testified that he did not look for a kill switch on the car but that he had reason to believe a switch was on the car. On recross-examination, he stated that he thought the car had a switch because he mentioned to Ms. Kinsler that the car would not start. He said Ms. Kinsler told him that a switch under the dash started the car.

4

Ralph Davis testified that he and the [petitioner] were friends and that he was a passenger in the [petitioner's] car on February 19, 2011. He said that the car would not start and that they were inside the car drinking when the police arrived. He said they were drinking inside the car because his sister would not allow them to drink in her house. He denied the [petitioner's] driving the car while under the influence. He said the [petitioner] was intoxicated by the time the police arrived.

Mr. Davis testified that he drove Ms. Kinsler to the towing company to obtain the [petitioner's] car. He said he installed a new fuse and taped up "the wire" when Ms. Kinsler entered the office. He denied attempting to start the car after installing the fuse and taping the wire. He said that Ms. Kinsler started the car and that he told her to go home because he did not know how long the car would operate. He denied being told to flip the kill switch.

On cross-examination, Mr. Davis testified that the [petitioner] drove the car that night and that at about 8:00 or 9:00 p.m., they arrived at the location where the car stopped running. He said they were returning from fishing. He said later, though, that they were returning from purchasing beer when the car stopped running. He denied the men drank alcohol while fishing. He said that the [petitioner] did not want to drink but that the [petitioner] was intoxicated by the time the police arrived. He said that they bought a twelve pack of beer and consumed most of it before the police arrived.

The [petitioner] testified that he believed the car stopped operating around 9:30 p.m. He said he and the Davis brothers went fishing earlier that day and returned to their sister's home to clean the fish. He said they decided to sit inside his car because their sister did not allow smoking and drinking in her home. He stated that his car stopped in the middle of the road, that he called a friend who worked on cars, that the friend did not answer his call, and that he began to drink. He denied that he drove the car while drinking and said the car would not start.

The [petitioner] testified that he did not tell the officers that the car would not start because he thought the officers were arresting him for public intoxication. He denied knowing he was being arrested for DUI. He said he was embarrassed by his actions that night and agreed he was intoxicated. He said he took the keys from the ignition because he thought he was going to jail. He said two small bottles of liquor were inside the car.

5

The [petitioner] testified that his car did not have a kill switch before the night of his arrest. He said that after his wife returned home with his car, the friend, whom he called after the car stopped running, worked on the car. He said that a wire attached to the fuse box and the steering column bracket "shorted out" and that his friend installed a "push button." He denied having electrical tape or being near a store to obtain the needed materials the night of his arrest. He said he called his friend because the friend had a tow truck if the car could not be repaired that night.

On cross-examination, the [petitioner] testified that he did not mention to the officers his going fishing or the car's not working. He said that he knew his car was in the road but that other drivers could drive around his car. He agreed he only told the officers that he and his wife argued and thought this might prevent his arrest for public intoxication. He said the kill switch was only an extra button that permitted the car to start if the electrical wires failed. He said the switch was installed in plain sight, not under the dash. He admitted he was on a public road and was intoxicated. He denied attempting to repair the car that night because he did not know what was wrong with it.

The [petitioner] testified that he called Rick Ballard that night, that Mr. Ballard came to court previously about this case, and that Mr. Ballard died before the trial. He said Mr. Ballard had been a "backyard mechanic" and had worked from his home.

The [petitioner] testified that he left his car in the road while he and the Davis brothers cleaned the fish they caught earlier that day. He denied drinking before they arrived at the location where the car stopped. He agreed he told the officers that he was there "to let him out" when asked why he was sitting in the car. He said that he meant he had not been driving on the road when he said, "no road," in the recording.

*Christopher S. Kinsler*, 2013 WL 5873075, at *1-4.

When assessing the sufficiency of the evidence, this court noted that Mr. Long's testimony that the petitioner's wife told him that the car had a "kill switch" contradicted the petitioner's testimony that the car was inoperable on the evening of his arrest and that a kill switch was installed after his wife retrieved the car from Mr. Long. The court stated that "[t]he jury's verdict shows that it credited Mr. Long and the police officers' testimony, that it discredited the [petitioner's] testimony, and that it found that the [petitioner] was in physical control of the car." *Id.* at *5. The court also observed that

6

the jury discredited the petitioner's testimony that he was not drinking and operating the vehicle before the vehicle stopped. *Id.*

On appeal, the petitioner also raised the issue of Mr. Long's testimony, arguing that it was inadmissible hearsay. *Id.* at *6-7. The court agreed that the testimony was hearsay but concluded that the issue was waived because the petitioner failed to object during trial. *Id.* at *7.

The petitioner filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel, who filed an amended petition.

At the post-conviction hearing, Louis Murphy testified that he had worked as an auto mechanic for over thirty years. He testified that he had previously performed work on 1995 Chevrolet Cameros. He explained that the ignition system on a Camero has "a kit that reads on resistance that goes to the [power train control module]." If an incorrect key is inserted into the ignition, the car's fuel and starter will be disabled. He testified that a 1995 Camero would not start if a mechanical aspect of the key was malfunctioning. He stated that he may have done repair work on the petitioner's 1995 Camero. When he was presented with a receipt from the petitioner, he agreed that it was his receipt. He testified that the document indicated that he repaired a problem with the vehicle's ignition. He stated that the petitioner's key switch had failed, and he testified that he "put a new key switch in [the car] to switch the electrical part." He explained that he had to pull apart the steering column to make the repair and that he installed "a new key fob" in the petitioner's car. He testified that the repairs were completed on April 20, 2011.

Trial counsel testified that he was retained to represent the petitioner when the case was in general sessions court. He testified that there was no testimony about "a kill switch" prior to trial and that the issue first arose when he was cross-examining Mr. Long. Mr. Long testified that the petitioner's wife was able to drive the car off of the tow lot without it needing any repair. Trial counsel asked Mr. Long how he knew that there had not been any repairs made, and Mr. Long testified that the petitioner's wife informed him that the car had a kill switch. When asked whether he made a tactical decision not to object to Mr. Long's answer, trial counsel answered, "I had opened the door and this is one where it is going to go into attorney/client privilege as to why I asked that question. So if you would like for me to go further, I'd be happy to." Trial counsel testified that the only other way to answer the question without breaching attorney/client privilege was to say that he "opened the door asking that question based on the information [he] had[,] and [he] did not feel the Court would sustain a hearsay objection based on a witness . . . answering the question directly that [he] had asked."

Trial counsel testified that he did not object when the State first asked Mr. Long whether he knew what a kill switch was on direct examination. He testified that the reason he made no objection again went "into the attorney/client privileged conversations."

On cross-examination, trial counsel testified that he did not ask Mr. Long about the kill switch during the preliminary hearing. He testified that he could not answer why he did not ask about the kill switch "without violating attorney/client privilege," and the post-conviction court indicated that the State would be limited to the answer that trial counsel could provide without breaching attorney/client confidentiality. Trial counsel clarified that he had no reason to ask about a kill switch at that point. He stated that he did not learn that the petitioner's car had a kill switch until Mr. Long's answer on cross-examination. Trial counsel agreed that he was "blindsided" by the information about the kill switch.

Trial counsel testified that based on the preliminary hearing and his pretrial conversations with Mr. Long, his theory of the case was that "there was no information that the car was capable of self-propulsion." Trial counsel testified that he believed that the hearsay "shot [his] theory out of the water." He stated that he thought the hearsay "killed [the case,] but there were other things that hurt [the case] as well." Trial counsel explained that he had "no knowledge of what the jury considered" in reaching its verdict. Trial counsel recalled that the jury asked to watch the video and that "they were very concerned with the brake lights, something about the lights coming on."

The petitioner testified that he recalled meeting with trial counsel and discussing his case prior to trial. When asked whether he and trial counsel discussed a kill switch or any other device that would prevent his car from starting, the petitioner responded that he did not know if he would "violate [his] client privilege" by answering. The petitioner testified that prior to his wife's statement, there had been no evidence introduced that the car was operational on the night of his arrest. The petitioner did not recall applying his brakes when an officer was behind the car, but he testified that he saw the brake lights visible in the video of the stop.

The petitioner testified that his vehicle was working earlier in the evening and that he had driven it to the location where it was stopped in the road. He testified that the car would not start when he attempted to return to his home and that he made the decision to consume alcohol after the car would not start. He agreed that the keys were in the ignition when officers arrived at the scene. He agreed that he did not tell officers that the car would not start.

8

The State called trial counsel as a rebuttal witness. He testified that he did not object when Mr. Long mentioned a kill switch because he "was blindsided" by the testimony. He explained that he had no reason to think that Mr. Long would have testified about a kill switch. He stated that if he had objected to the answer, he believed that the trial court would have ruled that he opened the door to the answer. He stated that he had never received any information about a kill switch in the petitioner's vehicle until he cross-examined Mr. Long.

The post-conviction court made oral findings and denied the petition. The court stated that the only potential fault in trial counsel's representation was asking the "why question" during cross-examination. The court noted that trial counsel made a strategic decision not to object to the answer to avoid unduly emphasizing the evidence for the jury. The court found that it would have ruled that the answer was admissible because trial counsel opened the door and that any objection "would have highlighted for the jury that something potentially harmful had come out of the perhaps ill-advised [']why['] question." The court found that the petitioner had failed to carry his burden of showing that trial counsel performed deficiently. The court noted that it did not believe it could "fully consider that issue without the waiver of the attorney/client privilege to allow [trial counsel] to testify fully about the decision in that cross-examination that resulted in the hearsay statements that were potentially harmful to the [petitioner]."

The court also found that the petitioner had failed to demonstrate that the inadmissible hearsay had a prejudicial effect. The court opined that it did not believe that the jury's verdict hinged on whether the petitioner's car had a kill switch but that the jury simply did not believe the testimony of the petitioner and Ralph Davis. The court observed that Mr. Davis "told more than one story during his testimony" and that the jury "had plenty of reason not to believe him." The court stated that both the petitioner and Mr. Davis were "both highly intoxicated," which called into question their ability to accurately observe and recall the events of the evening. The court stated that it was unquestioned that the vehicle was operational before the petitioner was arrested because the car was in the middle of the road. The court also noted that it was unquestioned that the vehicle was operational when the petitioner's wife retrieved it the next day. The court also noted that the petitioner did not mention anything to officers about his vehicle being unable to start or Ms. Davis's sister not allowing the men to drink alcohol in her home.

The court stated that as the thirteenth juror, it found that there "was plenty of evidence to support a finding beyond a reasonable doubt that [the petitioner] was in control of that vehicle, that the vehicle was operational and that he was, therefore, guilty of driving under the influence." The court opined that the circumstantial evidence of the petitioner's guilt "was overwhelming" and that "the circumstantial evidence that the vehicle would operate was sufficient to support a finding beyond a reasonable doubt that

9

it was operable." The court observed that video of the stop showed that the petitioner was in the driver's seat of the vehicle with his foot on the brakes and the key in the ignition. The court also noted that the petitioner's wife was able to drive the car away from the tow lot. The court stated that it based its ultimate ruling on the finding that the hearsay did not prejudice the defendant, "even if it was deficient to ask that question."

## ANALYSIS

On appeal, the petitioner argues that trial counsel rendered the ineffective assistance of counsel by eliciting inadmissible hearsay evidence about the kill switch on the petitioner's car. He contends that there was no strategic reason to ask Mr. Long that question and that trial counsel should have objected to Mr. Long's answer. He asserts that Mr. Long's testimony was the only evidence that the vehicle was operational on the evening of the petitioner's arrest and that but for the testimony, the outcome of his trial would have been different. The State responds that the petitioner received the effective assistance of counsel.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2010). The petitioner bears the burden of proving the allegations of fact giving rise to the claim by clear and convincing evidence. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). This court generally defers "to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013). Claims for post-conviction relief premised on ineffective assistance of counsel present mixed questions of law and fact, which this court reviews de novo with no presumption of correctness. *Id.*

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel. This right affords an individual representation that is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel is ineffective when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

10

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must prove that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the petitioner to the degree that the petitioner did not receive a fair trial. *Strickland*, 466 U.S. at 687. A petitioner satisfies the deficiency prong of the test by showing that counsel's representation fell below an objective standard of reasonableness; that is, "the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter*, 523 S.W.2d at 936); *see Strickland*, 466 U.S. at 687. The petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In order to fairly assess counsel's conduct, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Prejudice requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either deficiency or prejudice, post-conviction relief is not appropriate, and this court need not address both components if the petitioner makes an insufficient showing as to one component. *Grindstaff*, 297 S.W.3d at 216 (citing *Goad*, 938 S.W.2d at 370).

The petitioner claims that trial counsel should have objected to Mr. Long's testimony as hearsay and that trial counsel had no strategic basis for "asking a 'why' question." Trial counsel testified that he did not object to the response because he opened the door to the response, and the post-conviction court found that the decision not to object was a tactical one. Counsel's testimony was that his reasons for asking the question and not objecting had to do with privileged conversations he had with his client.[1] The petitioner's burden is to prove his factual allegations by clear and convincing

---

[1] We note that the attorney/client privilege is generally considered waived when the petition has put the effectiveness of counsel at issue. *Bryan v. State*, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992). Although the issue is not raised on appeal, the petitioner's failure to waive the privilege has interfered with his ability to show deficiency. Further, we note that the post-conviction court limited the State's cross-examination of trial counsel to the information that he could reveal without violating the privilege; however, as soon as the petitioner "alleges and seeks to prove constitutional error, the [S]tate should be

evidence, and he has not established that trial counsel performed deficiently. Moreover, the petitioner cannot show that he suffered prejudice. Even without Mr. Long's testimony, there was ample evidence that the petitioner's vehicle was operational. The petitioner drove the car to the place where he was arrested, and officers found him in the driver's seat of the vehicle with the keys in the ignition. He never told anyone that his vehicle was not operational at the time of the arrest. On direct appeal, this court concluded that "the jury's verdict shows that it discredited the [petitioner's] testimony that he was not drinking and driving before the car stopped." *Christopher Kinsler*, 2013 WL 5873075, at *5. Finally, the petitioner's wife was able to start the car and drive it off of the tow lot the next day when she came to retrieve it. We conclude that the petitioner has not shown that he received the ineffective assistance of counsel, and he is not entitled to any relief.

## CONCLUSION

Based upon the foregoing analysis, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

entitled to prove the absence of such error." *Id.* at 81; *see also Alex Biles, Jr. v. State*, No. 03-C-019104CR00123, 1991 WL 233245, at *3 (Tenn. Crim. App. Nov. 13, 1991).